

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DGR/LRO
F. #2018R00788

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 17, 2021

By ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Demettrius Wright,
                  Criminal Docket No. 20-239 (S-2) (BMC)

Dear Judge Cogan:

      The government writes in advance of the defendant Demettrius Wright's (the "defendant") sentencing, which is scheduled for July 9, 2021 at 10:00 a.m. The defendant, a self-professed member of the 5-9 Brims set of the Bloods street gang, worked with members and associates of the "Bully Gang" to sell cocaine base, also known as "crack," and heroin in Maine. For the reasons set forth below, the government respectfully submits that a sentence within the applicable range under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 46 to 57 months is appropriate.

    I.    Background

        A.    Overview of the Drug Trafficking Organization

      The defendant was a member of a complex and long running interstate drug trafficking operation that transported drugs and drug dealers from New York to Maine where they operated drug "trap" houses. (PSR ¶ 4). The conspiracy was led by members of the Bully Gang, a street gang operating principally in the Bedford-Stuyvesant section of Brooklyn, New York; those members included co-conspirators Moeleek Harrell, Derrick Ayers and Bermon Clarke, among others. (Id. ¶ 5). The Bully Gang had many criminal rackets, including the operation of the Maine drug trafficking operation, which generated hundreds of thousands of dollars each month through illegal drug sales. (Id. ¶ 9).

The Maine drug trafficking operation began at least as far back as 2016. Together with Harrell and others, Derrick Ayers and Bermon Clarke recruited drug dealers, often from Bed-Stuy, to travel to Maine to operate drug "trap" houses for weeks to months at a time. (Id. ¶ 5). The conspiracy's leaders would organize travel for the drug dealer, often sending him or her by bus from Manhattan to Boston, Massachusetts, and then from Boston to Portland, Maine, where the drug dealer would be transported to the trap house by other conspirators. (Id.)

The organization's "trap" houses were placed throughout Maine and changed from time to time to evade law enforcement scrutiny. (Id.) The "trap" houses were often assigned a designated cellular telephone for the trap house operator to conduct drug transactions and send the specific counts of money and drugs at the location back to Ayers and Clarke . (Id.) The conspirators referred to these devices as "trap phones." (Id.) To help evade law enforcement surveillance, these "trap" phones were replaced and recirculated frequently. (Id.)

The organization re-supplied drugs to the trap houses during the drug dealer's trip and used specialized vehicles to help accomplish this without law enforcement detection. (Id.) Specifically, in the course of the conspiracy, multiple vehicles with concealed "trap" compartments were used by co-conspirators, including Ayers, Clarke, Amanda Walton, and Nia Govan, to transport money and drugs between the trap houses. (Id.) At the time that Ayers, Clarke and others were arrested in June 2020, three cars were seized and searched by law enforcement that contained these concealed "trap" compartment, including the following:



Hidden Compartment in Volvo S90 Registered to Bermon Clarke[1]



---

[1] This compartment was installed behind the passenger side dashboard.

Hidden Compartment in Subaru Outback Registered to Nia Govan[2]



Hidden Compartment in Hyundai Sonata Seized from Derrick Ayers



B.   The Organization's Drug Sales and Money Laundering

Messages recovered from cellular telephones used by the conspirators, including Ayers, Clarke and the numerous "trap" phones used by individuals like the defendant, reveal the coordination of the drug operation and the large quantities of crack and heroin being distributed from each trap house. On an almost daily basis, Ayers and Clarke

---

[2]   This compartment was installed behind a vehicle control panel in the dashboard.

kept detailed drug counts for the trap houses in operation. For example, on August 8, 2019 Ayers and Clarke discussed the current supply of drugs at six trap houses in Maine:

> CLARKE: Lil homie
> [Redacted Street Address] Livermore me
> (100u)
>
> P (50u)(-25d)
>
> Cup
> [Redacted Street Address] Corinth me
> (50u)
>
> Fat nigga
> [Redacted Street Address] searsport
> (70u)
>
> Dirk
> [Redacted Street Address] Swanville
> (70u)
>
> Ace
> [Redacted Street Address] Troy me
> (50u +25d)
>
> Chuck
> [Redacted Street Address] Dixmont me
> (100u)
>
> AYERS: Lil homie wrong

In that exchange, Clarke identified each of the drug dealers assigned to the "trap" houses using their street names ("Lil homie" "P' "Cup" "Fat nigga" "Dirk" "Ace" "Chuck") along with the drug counts at each location, using "u" for "up" which is crack and "d" for "down" which is heroin. After receiving the counts, Ayers flagged that the drug counts for "Lil Homie" were "wrong."

The operators of the trap house would send Clarke detailed counts of the drugs they had on hand and sales made to date, a practice that the conspirators maintained for years using cellular telephones. For example, a message stored in Clarke's Apple iCloud dated back to May 2018, and had the following exchange between Clarke and a conspirator ("CC-1") operating a stash house:

4

      CC-1:        D 23.49f Old
                        D20.01f&9.4g1 New
                        U 22.42g
                        0.40g=50$U

In that message, CC-1 reported to Clarke the counts of drugs and money on hand, specifically counting the amount of crack ("U") and heroin ("D"). This practice continued throughout the conspiracy. For example, on November 8, 2019, Clarke received the following message from another co-conspirator who had just travelled from New York to Maine:

      CC-2:        6251
                        75u
                        51.85d
                        A:559
                        L:3051
                        T:10

In that message, CC-2 sent the amounts of crack (75 grams) heroin (51.85 grams) he had along with the amounts of the debts owed by certain customers previously identified by Clarke. On a regular basis, ranging from bi-weekly to every few days, the conspiracy's runners would pick up drug proceeds from the trap house operator and re-supply the house with drugs. That money was laundered using different methods, including washing the cash through large deposits into or wire transfers through intermediary bank accounts in the names of defendants Amy Sonnenblick, Amanda Walton, Christina Estevez and Chinasa Strachan, among others. (PSR ¶ 9).

      C.        <u>The Defendant's Multiple Trips to Maine to Operate Trap Houses</u>

Seized messages and location information for a cellular telephone used by the defendant showed that, between June 2019 and November 2019, the defendant made at least three trips to Maine to sell narcotics as part of the organization. (PSR ¶ 11, 19). While in Maine, the defendant used the nickname "Clean."

The defendant, who like many other trap house operators, was from the Bedford-Stuyvesant section of Brooklyn. On his November 2019 trip, surveillance cameras at a bus station on Canal Street captured images of the defendant and another co-conspirator ("CC-3") meeting with Clarke before the defendant and CC-3 boarded a Boston-bound bus together. Thereafter, they travelled by another bus to Maine, where defendant Amanda Walton met them and reported back to Clarke, "I got the guys from the bus."

Between November 8, 2019 and November 19, 2019, the defendant posted multiple videos to Instagram from inside of a home. In those videos, the defendant is seen with large stacks of cash consistent with the proceeds generated by the drug sales at the trap house. During that time, the defendant also messaged with CC-3 via Instagram and expressed how happy he was selling drugs in Maine:

| | |
|---|---|
| WRIGHT: | U got any sleep |
| CC-3: | A lil bit |
| CC-3: | Er time I try to relax somebody bummin |
| CC-3: | Feels great tho never got to the trap like this |
| WRIGHT: | Gangsta |
| WRIGHT: | Straight lash flow |
| CC-3: | U sleep? |
| WRIGHT: | A lil bit |
| WRIGHT: | U know the vibez doh |
| WRIGHT: | Trap star LifeStyle |
| CC-3: | Fakts |

In that exchange, the defendant asked CC-3 if he had slept, and CC-3 responded that he slept a little, but that it felt great because he had never sold drugs in this way before, referring to their drug dealing as getting "to the trap." The defendant stated that the drug dealing was lucrative, calling it "straight [c]ash flow," and glorified it, saying they were living the "Trap star LifeStyle."

Like other trap house operators, the defendant provided regular updates on the narcotics sales, which were often passed on to Clarke through defendant Amanda Walton. Walton sent Clarke numerous messages detailing the defendant's drug counts, such as "Clean 14u 15d", "Clean 11d 41u", "Clean- 50d", "Clean 2,000 +50d" and "Clean 4140 +50u". Those messages used the letter "d" as an abbreviation for "down," which is a slang term for heroin, an opiate. They used the letter "u" for "up," which is a slang term for crack cocaine, a stimulant. Those messages also reflect the thousands of dollars in cash the defendant generated for the organization through the drug sales.[3]

Throughout the time the defendant participated in the drug conspiracy, he was a self-identified member of the 5-9 Brims, a street gang that is a set of the Bloods. The gang's violent nature and effects across New York City has been shown in multiple cases. See, e.g., United States v. Jeffrey Bush et al., No. 19-CR-378 (PKC) (E.D.N.Y.); United States v. Willie Evans et al., No. 20-CR-57 (GBD) (S.D.N.Y.).

The defendant used his social media accounts to promote his membership in the 5-9 Brims. For example, on October 26, 2019, the following picture of the defendant and

---

[3] The drug quantity attributed to the defendant was derived from counts recovered from electronic communications, though that number is likely a conservative estimate of the total quantity of drugs distributed by the organization during the time the defendant participated in the conspiracy as reflected by the more than six kilograms of cocaine seized at the time of the June 25, 2020 arrests of Ayers and Clarke.

others displaying the 5-9 Brims' gang sign was posted to the defendant's Facebook and Instagram:



The hand gesture they displayed was used to symbolize a "hat", as a reference to a hat's "brim." On Instagram, the defendant tagged "@iamdeadeye59", an Instagram account used by Robert Baley, also known as "Deadeye," a 5-9 Brims member who is currently charged with racketeering as a member of the 5-9 Brims.[4] Similarly, a July 2019 post to the defendant's Facebook promoted his membership in the 5-9 Brims referring to its members as members of an "army."

    II.    <u>Applicable Guidelines Range</u>

The defendant pled guilty to the lesser included offense of violating 21 U.S.C. §§ 846 and 841(b)(1)(C). The applicable Guidelines range, as set forth in the PSR and the parties' plea agreement, is not in dispute:

| | | |
|---|---|---|
| Base Offense Level (§§ 2D1.1(a)(5) and 2D1.1(c)(8)) | | 24 |
| Plus: | Maintained Premises for Purpose of Manufacturing/Distributing (§ 2D1.1(b)(12)) | +2 |
| Total: | | <u>26</u> |

---

[4] Robert Baley, also known as "Deadeye," is currently under indictment for racketeering, drug, and firearms offenses in the Southern District of New York. See <u>United States v. Willie Evans et al.</u>, No. 20-CR-57 (GBD) (S.D.N.Y.).

7

      Less: Acceptance of Responsibility (§ 3E1.1(a))      -3

      Adjusted Offense Level:      23

With a Criminal History Category of I and an adjusted Offense Level of 23, this produces a Guidelines range of 46 to 57 months.

### III. The Appropriate Sentence

#### A. Applicable Law

In United States v. Booker, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory. The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns. Booker, 543 U.S. at 220; see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable. [The sentencing court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner. The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(1)-(6).

B. <u>Discussion</u>

Given the seriousness of the instant offense, the defendant's criminal history and gang membership, the Court should sentence the defendant to a significant term of imprisonment within the applicable Guidelines range of 46 to 57 months.

As detailed above, the Maine drug trafficking scheme was a long-term, widespread, and sophisticated operation. For years, the co-conspirators were responsible for trafficking devastating quantities of narcotics, including crack and heroin, between New York and Maine, and dispersing those narcotics into the surrounding communities. Members of the conspiracy employed extensive measures to conceal their crimes and evade law enforcement detection, including specialized vehicles with concealed compartments and a rotating supply of "trap" phones that were routinely replaced and recirculated. To protect their illegal business, the defendant's conspirators carried numerous firearms. All told, the operation generated hundreds of thousands of dollars in proceeds at the expense of communities throughout the northeast.

The defendant played a pivotal role in sustaining the operations of the drug trafficking conspiracy. At least three times in 2019, the defendant traveled from New York to Maine, where he was responsible for operating a trap house used to store and sell narcotics. Communications among the co-conspirators, including text messages between the defendant and a leader of the conspiracy, reflect the substantial quantities of money and drugs that the defendant managed on behalf of the operation.

The three identified trips taken by the defendant distinguishes him from other members of the conspiracy, some of whom had only a single identified trip. His repeated trips reflect the level of trust the defendant had with his conspirators and reflects how willing the defendant was to violate the law solely to enrich himself and harm the drug users to whom he sold. As reflected in his social media posts during his November 2019 trip to Maine, the defendant lionized this lawlessness, posting numerous pictures and videos of himself in Maine with drug proceeds and gloating with CC-3 about being a "TrapStar."

Significantly, the defendant's conduct is the culmination of his already-serious criminal history. The defendant has been arrested at least four times since 2016, including for multiple violent felony offenses. In addition to his prior conviction—which arose out of an assault of two victims—the defendant faces pending charges for, among other things, possessing a defaced firearm, assaulting police officers, discharging a firearm on a Brooklyn street, and fleeing his girlfriend's apartment with his naked child following a physical altercation. He has a history of violence that, as detailed in the PSR, includes a disturbing assault of a woman captured on video, an incident that Magistrate Judge James Orenstein described as an act of "extreme violence." (June 30, 2020 Bail Hr'g Tr. 10:4-5). An admitted gang member, the defendant routinely promoted his 5-9 Brims membership and his association with fellow "army" members on social media.

9

The gravity of the defendant's conduct, and the clear need for specific deterrence, warrant a serious response. A sentence within the applicable Guidelines range of 46 to 57 months is therefore appropriate.

In his sentencing submission, the defendant asks the Court to vary below the applicable Guidelines range and impose a sentence of 24 months incarceration based largely on the defendant's personal history and challenging childhood. The government does not discount those factors highlighted by the defendant and Probation, but submits the mitigating effect of those facts are captured in the wide Guidelines range available to the Court and do not support a nearly 50% reduction to the bottom of the applicable Guidelines in this case.

IV. <u>Conclusion</u>

For the reasons set forth above, the government submits that a sentence within the applicable Guidelines range of 46 to 57 months is appropriate.

Respectfully submitted,

MARK J. LESKO
Acting United States Attorney

By:     /s/
Drew G. Rolle
Nicholas J. Moscow
Lindsey R. Oken
    Assistant U.S. Attorneys

Virginia T. Nguyen
    Special Assistant U.S. Attorney

(718) 254-7000

cc:  Zachary Margulis-Ohnuma, Esq. (Counsel to the defendant) (by ECF)
     Victoria Medley, Esq. (Counsel to the defendant) (by ECF)
     U.S. Probation Department (by E-Mail)